**Cynthia Y. DOWLES Appellant**

v.

**Jo Anne B. BARNHART,[1] Commissioner of Social Security Appellee**

**No. CIV.A. 99–0631–M.**

United States District Court, W.D. Louisiana. Monroe Division.

March 31, 2003.

1. On November 9, 2001, Jo Anne B. Barnhart became the Commissioner of Social Security. In accordance with Rule 43(c)(2) of the Federal Rules of Appellate Procedure, Ms. Barnhart is substituted for Larry G. Massanari as the appellee in this action.

---

## *JUDGMENT*

JAMES, District Judge.

For the reasons contained in the Report and Recommendation of the Magistrate Judge previously filed herein, and after an independent review of the entire record and the written objections filed herein, and concurring with the Magistrate Judge's findings under the applicable law;

IT IS ORDERED that Cynthia Y. Dowles' appeal is GRANTED, the final decision of the Commissioner is REVERSED and VACATED, and Dowles is AWARDED SSI benefits from June 3, 1997.

IT IS FURTHER ORDERED that the case is REMANDED to the Commissioner for a calculation of Dowles' SSI benefits from June 3, 1977.

### *REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE*

KIRK, United States Magistrate Judge.

Cynthia Y. Dowles ("Dowles") filed an application for supplemental security income ("SSI") on June 3, 1997 (protective filing date) (Tr. p. 80), alleging a disability onset date of November 15, 1993 (Tr. p. 80), due to systemic lupus erythematosus (Tr. p. 85).[2] That application was denied by the Social Security Administration

---

**2.** Supplemental Security Income disability benefits, authorized by Title XVI of the SSA,

("SSA") both initially (Tr. p. 66) and on reconsideration (Tr. p. 71).

A de novo hearing was held before an Administrative Law Judge ("ALJ") on April 8, 1998 (Tr. p. 23) at which Dowles appeared with an attorney and two witnesses. The ALJ found that, although Dowles suffers from severe lupus, she had the residual functional capacity to perform the full range of light work, so a finding of "not disabled" was directed by Rule 202.20, Table 2, Appendix II. The Appeals Council declined to review the ALJ's decision (Tr. p. 4), which became the final decision of the Commissioner of Social Security ("the Commissioner"). However, when Dowles sought judicial review of the Commissioner's decision, the Commissioner filed a motion for remand for the purpose of considering and evaluating the evidence from Dr. David Thompson, as well as any new medical evidence submitted by Dowles, and to hold another hearing.

That motion was granted on October 15, 1999 (Tr. pp. 233–234).

On remand, a hearing was held on May 24, 2000, before an ALJ, at which Dowles appeared with her attorney and two witnesses (Tr. p. 289). On August 7, 2000, the ALJ found that Dowles was able to perform the full range of light work and, therefore, Rule 202.20 of Table 2, Appendix II, directed a fining of "not disabled." The Appeals Council again declined to review the ALJ's decision (Tr. p. 4), and the ALJ's decision became the final decision of the Commissioner.

Dowles next filed an appeal, seeking judicial review of the Commissioner's decision, which the Commissioner answered. Dowles' appeal is now before the court for disposition.

### Summary of Pertinent Facts

Dowles was diagnosed with systemic lupus erythematosus ("SLE")[3] in November

---

provide assistance to the disabled needy without regard to the claimant's history of coverage under the Social Security Act. Its qualifying financial tests are income and resource tests. Ineligibility for DIB under Title II does not affect eligibility for SSI under Title XVI. *Thomas v. Schweiker,* 666 F.2d 999, 1001 (5th Cir.1982). If a claimant filed an application for SSI benefits before the first month he meets all the other requirements for eligibility, the application remains in effect from the date it is filed until a final determination is made on the application, unless there is a hearing decision on the application, in which case the application remains in effect until the hearing decision is issued. 20 C.F.R. § 416.330. If a claimant meets all the requirements for SSI eligibility after the period in which his application was in effect, he must file a new application for benefits. 20 C.F.R. § 416.330(b). The earliest month for which an eligible SSI claimant can receive benefits is the month following the month his application was filed, 20 C.F.R. § 416.335, or the month following the month during the pendency of the application that the claimant meets all the eligibility requirements, 20 C.F.R. § 416.330(a).

**3.** According to the National Institute of Arthritis and Musculoskeletal and Skin Diseases, Health Topics, Lupus, Handout on Health: Systemic Lupus Erythematosus, *available at* www.niams.nih.gov (from the Department of Health and Human Services, National Institutes of Health), Systemic Lupus Erythematosus ("SLE") is a disorder of the immune system known as an autoimmune disease in which the body harms its own healthy cells and tissues, leading to inflammation and damage to various body tissues. The cause of lupus is unknown and there is no cure for lupus, but it can be successfully treated with drugs. Lupus can affect the joints, skin, kidneys, heart, lungs, blood vessels, and brain. Common symptoms include extreme fatigue, painful or swollen joints (arthritis), muscle pain, unexplained fever, red skin rashes (usually on the face), kidney problems, chest pain upon deep breathing, unusual hair loss, pale or purple fingers or toes from cold or stress (Raynauds' phenomenon), sensitivity to the sun, edema in legs or around eyes, and swollen glands. Lupus is characterized by periods of illness, called flares, and periods of wellness, or remission. The warning signs of a flare are increased fatigue, pain, rash, fever,

1993 by Dr. William David Thompson, a family practitioner, when she was admitted to the hospital for chest pain, pneumonia, alopecia (hair loss), and hand pain and swelling (Tr. pp. 136–146). Laboratory tests showed Dowles' liver was in the upper normal size. Dowles had a butterfly-type rash on her face,[4] both hands were tender and had swelling over PIPs, MCP joints, and wrists (Tr. p. 141). Dowles' lupus and symptoms were treated with Medrol, Naprosyn, Suprax, and Tagamet (Tr. p. 136).

The medical records show Dowles suffered a "lupus crisis" in September 1996 (Tr. pp. 165–166), with swelling in her feet and headaches. Dowles also had anemia and leukopenia (Tr. pp. 162–165).

Tests in October 1996 and May 1997 showed Dowles' heart and lungs were normal (Tr. pp. 155, 163). In June 1997, an x-ray of Dowles' chest was normal (Tr. p. 172), a gall-bladder ultrasound was normal, and an upper GI series snowed only minimal nonspecific distal antritis and duodenal bulb duodenitis (Tr. p. 179). In August 1997, the results of a CT scan of Dowles' brain were normal (Tr. p. 170).

On July 17, 1997, Dr. Hayan Orfaly, an internist, examined Dowles at the request of the SSA (Tr. pp. 167–168). Dr. Orfaly found that Dowles had mild to moderate SLE, with symptoms of loss of almost all of her hair, "off and on" swelling of her feet and hands, blurry vision, fever that comes and goes, difficulty sleeping, generalized body aches related to the weather, significant mood swings and depression, weight loss, decreasing appetite, and epigastric pain related to taking steroid medication (Tr. p. 167). Incredibly, Dr. Orfaly noted there was "no history of hematuria, skin lesions or rash," and found no edema at that time (Tr. p. 167). Dr. Orfaly went on to note that he believed Dowles could carry ten pounds with either hand. Dr. Orfaly diagnosed mild to moderate SLE, and indicated a need to rule out peptic ulcer disease secondary to the steroid use which could explain the weight loss (Tr. p. 168). Finally, Dr. Orfaly stated that SLE is a "chronic systemic disease that will not be cured and will have periods with exacerbations and worsening," but that "at this time the patient is able to work, especially after her medications are adjusted" (Tr. p. 168).

A January 1998 medical report shows Dowles was diagnosed with arthralgia, arthritis, fever, malaise, anemia, and painful, red, swollen joints at times, all secondary to lupus (as indicated by a positive ANA

---

abdominal discomfort, headache and dizziness.

Systemic lupus erythematosus means the disease can affect many parts of the body. Discoid lupus erythematosus refers to a skin disorder in which a red, raised rash appears on the face, scalp or elsewhere, the raised areas may become thick and scaly and may cause scarring, and the rash may last for days or years and may recur. A small percentage of people with discoid lupus also have or develop SLE.

Body systems can also be affected by lupus, as follows: (1) kidneys—inflammation of the kidneys (nephritis) can impair their functioning, (2) lungs—develop pleuritis, an inflammation of the lining of the chest cavity which causes pain, particularly with breathing, and may develop pneumonia, (3) brain or central nervous system—causes headaches, dizziness, memory disturbances, vision problems, stroke, or changes in behavior, (4) blood vessels—vessels may become inflamed (vasculitis), affecting the way blood circulates through the body, (5) blood—may develop anemia, leukopenia (a decreased number or white blood cells), thrombocytopenia (a decreased number of platelets), or abnormalities which cause an increased risk for blood clots, and (6) heart—inflammation may occur in the heart itself (myocarditis and endocarditis) or the membrane that surrounds it (pericarditis), causing chest pain or other symptoms, and can increase the risk of atherosclerosis.

4. A classic SLE sign.

test (Tr. p. 189)). The report went on to note that lupus goes into remission at best, but is never cured, and there is always the potential for life threatening exacerbations (Tr. p. 189).

In May 1998, Dr. Thompson gave a written explanation of Dowles' medical condition (Tr. pp. 194–196). Dr. Thompson stated that he has treated Dowles regularly since November 1993, and that Dowles has suffered from arthralgia and arthritis in her upper and lower large weight·bearing joints as well as the small joints and wrists with swelling, pain and fever, all of which had for quite some time previously been undiagnosed (Tr. p. 194). In November 1993, when Dowles was admitted to the hospital for treatment of pneumonia, she also had significant liver swelling and significant swelling of joints, which were red hot and extremely painful (Tr. p. 194). Since SLE was diagnosed from Dowles' blood work, Dowles was prescribed very high doses of cortisone as well as anti-inflammatory medication, to which she responded. Dowles began treatment by Dr. Rangaraj in the rheumatology clinic (Tr. p. 194). Dr. Thompson noted that, since 1993, Dowles has been a frequent, regular and compliant patient (Tr. p. 195). Dowles' treatment regimen consists of non-steroidal anti-inflammatories, steroids (which she is dependent on), and, from Dr. Rangaraj, Hydrocholoquin (Tr. p. 195).

Dr. Thompson also states in his May 1998 report that Dowles has multiple organ/body system involvement caused by the SLE: her skin manifests severe scarring (the worst of which is over her chest) and disfiguring rashes; her central nervous system is involved through cereblitis (frequent, recurrent headaches) for several years; her liver is involved as indicated by its enlargement; continuous anemia causes malaise, prostration and decreased energy; her muscles are involved as evidenced by persistent elevations of her CPK (an enzyme released from the muscle when there is muscle damage), caused by both the SLE and the steroid medication; progressive weight loss caused by decreased appetite, nausea and vomiting; and Dowles has a very low bone mineral density (osteoporosis), probably caused by the steroid medication, which puts Dowles at an extremely high risk for fractures (about eight times more than normal, which is very unusual for someone of Dowles' age and ethnicity) (Tr. pp. 195, 198). Dr. Thompson noted that Dowles was young to have so much involvement of the SLE in her body, and that her prognosis was poor (Tr. p. 196).

In January 1998, Dowles had a flare up of arthralgia and arthritis in her wrists, shoulders and neck (Tr. p. 189). In February 1998, Dowles was diagnosed with osteoporosis, with low bone mineral density and increased fracture risk which was "very unusual in her ethnic group" (Tr. pp. 197–199). In May through June 1998 (Tr. pp. 265–271), Dowles had a flare-up involving discoid lupus[5] (rash and itching) and vascular headaches. Dowles again had discoid lupus "all over" in July 1998 (Tr. pp. 266–267) and August 1998 (Tr. p. 265). In September 1998, Dowles developed pharyngitis (Tr. p. 264). In January 1999, Dowles had another flare-up with arthritis, acute pharyngitis, headaches, and mild right leg edema (Tr. p. 260). In July 1999, Dowles again developed pharyngitis, an

**5.** Discoid lupus erythematosus refers to a skin disorder in which a red, raised rash appears on the face, scalp, or elsewhere. The raised areas may become thick and scaly and cause scarring. The rash may last for days or years and may recur. A small percentage of people with discoid lupus have or develop SLE. National Institute of Arthritis and Musculoskeletal and Skin Diseases, Health Topics, Lupus, Handout on Health: Systemic Lupus Erythematosus, available at www.niams.nih.gov (from the Department of Health and Human Services, National Institutes of Health), Systemic Lupus Erythematosus ("SLE").

upset stomach, and her mouth was breaking out with sores (Tr. pp. 257–259). In September 1999, Dowles had acute pharyngitis and sores breaking out in her mouth which caused difficulty in speaking (Tr. p. 256).

In February 2000, Dowles had a lupus flare-up which involved a severe itchy rash and edema in her head, hands, and feet (Tr. p. 255). In May and June 2000 (Tr. p. 273–287), Dowles had an acute flare up, with discoid lupus and malar rash on her face, neck and back, hoarseness, sore throat, chest rales, edema in her face and neck, leukopenia, and anemia.

A CT scan of Dowles' brain in May 1998 was normal (Tr. p. 272). A May 1998 EEG was also normal (Tr. p. 271). X-rays of Dowles' chest in June 2000 showed her heart was not enlarged, but the radiologist found a "prominence of the major and minor fissures" and some "minimal increased interstitial markings" which "could represent some borderline congestive heart failure" or "may simply represent some interstitial thickening of a chronic nature" (Tr. p. 281).

Dowles was evaluated by Dr. David Hebert, an internist and pulmonary specialist, in April 2000 at the request of the SSA (Tr. p 245). Dr. Hebert noted Dowles' history of SLE, found severe hair loss over Dowles' head (Tr. p. 246), and noted scarring over Dowles' chest but no active rashes or lesions at that time (Tr. p. 247); Dr. Hebert found no abnormalities in Dowles' neurological exam (Tr. p. 247). Dr. Hebert diagnosed mild SLE, well-controlled with a medium dose of prednisone, no evidence of end organ damage, and no evidence of muscle weakness or atrophy (Tr. p. 248). Dr. Hebert concluded that Dowles' SLE did not cause any functional impairment with routine or normal walking, sitting or standing for an eight hour day; also, Dowles was mentally alert without any neurological deficits (Tr. p. 248).

At her May 2000 administrative hearing, Dowles testified that she was 40 years old, had four children, two of whom lived with her, is a high school graduate, and can read, write and do basic math (Tr. pp. 294–296). Dowles testified that she has past work experience as a housekeeper, but had not worked since 1992 due to her illness (Tr. p. 297). Dowles testified that she can no longer work due to the SLE symptoms, such as arthritis, rashes, and swelling in her face (Tr. p. 298). Dowles testified that her children do everything for her, and she mostly just sits and watches television (Tr. p. 298–299). Dowles admitted that she smokes, though had not done so for two weeks due to bronchitis, and stated that she did not drink alcohol, although she used to before she found out she had lupus (Tr. pp. 300–302). Dowles stated that her ability to lift, stand and walk depends on the weather, her arthritis, and pain and swelling in her extremities (Tr. pp. 302–304). Dowles further testified that she is always fatigued, some days worse than others, and that hot weather makes her feel worse (Tr. pp. 306–307). Dowles testified that she takes her medication as prescribed (Tr. p. 306).

A witness for Dowles, Africa Walker, testified that she sees Dowles every day and that Dowles cannot seem to get comfortable on her bad days (Tr. pp. 310–311). Walker also testified that Dowles seems to spend about half of her time lying down and the rest of the time sitting; Dowles' strength is not good (Tr. pp. 311–312).

Kimberly Dowles, one of Dowles' children who lives with her, testified that she had just graduated from high school (Tr. p. 312), and that she helps her mother dress, get in and out of her bed and bath, and clean up; Kimberly testified she has to do these things because Dowles frequently has trouble with her joints and is very weak (Tr. pp. 312–313). Kimberly stated

that she believes Dowles' condition has gotten much worse over the last three years (Tr. pp. 313–314).

## ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. § 404.1520(a) and 20 C.F.R. § 416.920(a). The sequential process required the ALJ to determine whether Dowles (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir.1994), cert. den., 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing *Lovelace v. Bowen,* 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. *Greenspan,* 38 F.3d at 237.

In the case at bar, the ALJ found that Dowles has no past relevant work, has not engaged in substantial gainful activity since November 15, 1993, and has a severe impairment of systemic lupus erythematosus, but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 20). The ALJ then found that, as of August 7, 2000, Dowles was able to perform the full range of light work and that Rule 202.20 of Table 2, Appendix II, directed a finding of "not disabled."

## Scope of Review

■ In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. § 405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. *Crouchet v. Sullivan,* 885 F.2d 202, 204 (5th Cir.1989). For the evidence to be substantial, if must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. *Falco v. Shalala,* 27 F.3d 160, 162 (5th Cir.1994), citing *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. *Singletary v. Bowen,* 798 F.2d 818, 823 (5th Cir.1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. *Fraga v. Bowen,* 810 F.2d 1296, 1302 (5th Cir.1987); *Dellolio v. Heckler,* 705 F.2d 123, 125 (5th Cir.1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. *Allen v. Schweiker,* 642 F.2d 799, 801 (5th Cir.1981). Also, *Anthony v. Sullivan,* 954 F.2d 289, 295 (5th Cir.1992). The court does have authority, however, to

set aside factual findings which are not supported by substantial evidence and to correct errors of law. *Dellolio,* 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *Johnson v. Bowen,* 864 F.2d 340 (5th Cir.1988); *Dellolio,* 705 F.2d at 125.

*Errors by the Commissioner and the ALJ*

Dowles contends the ALJ erred in failing to find that she meets Listing 14.02 of Appendix I. The ALJ stated in his decision (Tr. p. 210), "The claimant has no impairment which meets the criteria of any listed impairments described in Appendix 1 of the Regulations ( 20 C.F.R., Part 404, Subpart P, Appendix 1). No treating or examining physician has mentioned finding equivalent in severity to the criteria of any listed impairment."

A claimant has the burden of proving that his condition meets or equals an impairment listed in Appendix 1. *Sullivan v. Zebley,* 493 U.S. 521, 110 S.Ct. 885, 891–92, 107 L.Ed.2d 967 (1990). Also, *Selders v. Sullivan,* 914 F.2d 614, 619(5th Cir.1990). Where the impairment is severe, the Commissioner must determine whether the impairment is so severe that the claimant will be presumed to be disabled. This determination is made by comparing the impairment to a specific Listing of Impairments in the SSA regulations. See 20 C.F.R. § 404, Subpart P, Appendix 1. If the claimant's condition is listed, or is medically equivalent to a listed impairment, the claimant is conclusively determined disabled. *Cieutat v. Bowen,* 824 F.2d 348, 351 n. 1 (5th Cir.1987). Also, *Selders,* 914 F.2d at 619 n. 1.

The ALJ is charged with carefully considering all the relevant evidence and linking his findings to specific evidence. A bare and summary conclusion that a plaintiff does not meet the criteria of any listing is beyond meaningful judicial review. *Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir.2001).

Listing 14.02 states:

14.02 Systemic lupus erythematosus. Documented as described in 14.00B1, with:

A. One of the following:

1. Joint involvement, as described under the criteria in 1.00; or

2. Muscle involvement, as described under the criteria of 14.05; or

3. ocular involvement, as described under the criteria in 2.00ff; or

4. Respiratory involvement, as described under the criteria in 3.00ff; or

5. Cardiovascular involvement, as described under the criteria in 4.00ff or 14.04D; or

6. Digestive involvement, as described under the criteria in 5.00ff; or

7. Renal involvement, as described under the criteria in 6.00ff; or

8. Skin involvement, as described under the criteria in 8.00ff; or

9. Neurological involvement, as described under the criteria in 11.00ff; or

10. Mental involvement, as described under the criteria in 12.00ff.

or

B. Lesser involvement of two or more organs/body systems listed in paragraph A. with significant, documented, constitutional symptoms and signs of severe fatigue, fever, malaise, and weight loss. At least one of the organs/body systems must be involved to a least a moderate level of severity.

Listing 14.00B(1), states:

1. Systemic lupus erythematosus (14.02)—This disease is characterized clinically by constitutional symptoms and signs (e.g., fever, fatigability, ma-

laise, weight loss), multisystem involvement and, frequently, anemia, leukopenia, or thrombocytopenia. Immunologically, an array of circulating serum auto-antibodies can occur, but are highly variable in pattern. Generally the medical evidence will show that patients with this disease will fulfill The 1982 Revised Criteria for the Classification of Systemic Lupus Erythematosus of the American College of Rheumatology.[6]

**6.** The 1982 revised criteria for classification of systemic lupus erythematosus are:

1. Malar rash—Fixed erythema, flat or raised, over the malar eminences, tending to spare the nasolabial folds.

2. Discoid rash—Erythematous raised patches with adherent keratotic scaling in the follicular plugging; atrophic scarring may occur in older lesions.

3. Photosensitivity—Skin rash as a result of unusual reaction to sunlight, by patient history or physician observation.

4. Oral ulcers—Oral or nasopharyngeal ulceration, usually painless, observed by physician.

5. Arthritis—Nonerosive arthritis involving 2 or more peripheral joints, characterized by tenderness, swelling, or effusion.

6. Serositis—(a) Pleuritis—convincing history of pleuritic pain or rubbing heard by a physician or evidence or pleural effusion, OR (b) Pericarditis—documented by ECG or rub or evidence of pericardial effusion.

7. Renal disorder—(a) Persistent proteinuria greater than 0.5 grams per day or greater than 3 + if quantitation not performed, OR (b) Cellular casts—may be red cell, hemoglobin, granular, tubular, or mixed.

8. Neurologic disorder—(a) Seizures—in the absence of offending drugs or known metabolic derangements; e.g. uremia, ketoacidosis, or electrolyte imbalance, OR (b) Psychosis—in the absence of offending drugs or known metabolic derangements, e.g. uremia, ketoacidosis, or electrolyte imbalance.

9. Hematologic disorder—(a) Hemolytic anemia—with reticulocytosis, OR (b) Leukopenia—less than 4,000/mm<>3<>ror al on 2 or more occasions, OR (c) Lphpenia—less than 100,000/mm<>3<>on 2 or more occasions, OR (d) Thrombocytopenia—less than 100,000/mm<>3<>in the absence of offending drugs.

10. Immunologic disorder—(a) Positive LE cell preparation, OR (b) Anti–DNA: antibody to native DNA in abnormal titer, OR (c) Anti–Sm: presence of antibody to Sm nuclear antigen, OR (d) False positive serologic test for syphilis known to be positive for at least 6 months and confirmed by Treponema pallidum immobilization or fluorescent treponemal antibody absorption test.

11. Antinuclear antibody—An abnormal titer of antinuclear antibody by immunofluorescence or an equivalent assay at any point in time and in the absence of drugs known to be associated with "drug-induced lupus" syndrome.

*The proposed classification is based on 11 criteria. For the purpose of identifying patients in clinical studies, a person shall be said to have systemic lupus erythematosus if any 4 or more of the 11 criteria are present, serially or simultaneously, during any interval of observation.

See The American College of Rheumatology at *www.rheumatology.org*.

■■■ There is no indication in the ALJ's decision that he considered Listing 14.02, which applies specifically to Dowles' impairment. Instead, the ALJ gave "a bare and summary conclusion that a plaintiff does not meet the criteria of any listing," a conclusion which is "beyond meaningful judicial review." Compare, *Bogyus v. Secretary of HHS*, 996 F.2d 1214, 1993 WL 216481 (6th Cir.1993) (claimant with SLE); *Sarchese v. Barnhart*, 2002 WL 1732802 (E.D.N.Y.2002) (claimant with SLE).[7]

**7.** After essentially by-passing Appendix I, the ALJ went on to further err by relying on the medical-vocational guidelines in Appendix II.

The U.S. Supreme Court has upheld the use of these guidelines by the Commissioner in lieu of calling a vocational expert to testify. *Heckler v. Campbell*, 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). Also, *Harrell v. Bowen*, 862 F.2d 471, 478 (5th Cir.1988). However, the guidelines may not be applied when a claimant suffers solely from a nonexertional impairment. *Pate v. Heckler*, 777 F.2d 1023, 1026 (5th Cir.1985), citing *Martin v. Heckler*, 748 F.2d 1027, 1034–35 (5th Cir. 1984). Also, *Broussard v. Bowen*, 828 F.2d

Since Dowles filed her application for SSI benefits in 1997, and the Commissioner has reviewed this case twice, including two administrative hearings, and has committed serious procedural errors in making her decisions both times, it would be manifestly unfair to Dowles to remand this case for a third review by the Commissioner, with all the lengthy administrative delays that would entail. It is time for this case to be decided by the court.

*Listing 14.02*

The Court must determine whether Dowles meets Listing 14.02 in order to be *presumed* disabled, regardless of residual functional capacity.

Pursuant to the American College of Rheumatology 1982 Revised Criteria for Classification. of Systemic Lupus Erythematosus (at www.rheumatology.org), the medical evidence of record. shows that Dowles meets at least six of the 11 listed criteria (only four being necessary to support a finding SLE): malar rash [8], discoid rash,[9] oral ulcers, arthritis, serositis,[10] and antinuclear antibodies.[11] Since every physician to examine Dowles has found that Dowles has active SLE, Dowles meets the threshold requirement for Listing 14.02. The next step is to determine whether Dowles meets subsections (A) or (B) of Listing 14.02.

310, 313 (5th Cir.1987); *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir.1986). Since the guidelines are predicated on an individual's having an impairment which manifests itself by limitations in meeting strength requirements of jobs, they may not be fully applicable where the nature of an individual's impairment does not result in such limitations, e.g. certain mental, sensory, or skin impairments. The rules do not direct factual conclusions of disabled or not disabled for individuals with solely nonexertional types of impairments. 20 C.F.R. Subpt. P, App. 2, § 200.00(e). *Broussard*, 828 F.2d at 313. The Fifth Circuit has consistently held that once the ALJ determines that a claimant suffers from a nonexertional impairment, the Commissioner must produce expert vocational testimony or other similar evidence to establish that jobs.exist in the nation economy that the claimant can perform. *Fields*, 805 F.2d at 1170, and cases cited therein.

Since systemic lupus erythematosus is a nonexertional impairment, the ALJ clearly erred in relying on the medical-vocational guidelines to find Dowles is not disabled.

Finally, in relying on the medical-vocational guidelines, the ALJ also erred by failing to give any consideration to Dowles' medication side effects and the impact of periodic SLE flare-ups on her ability to keep a job.

8. Malar rash, or butterfly rash, appears on the face and the nose. From MEDLINE Plus Medical Encyclopedia: Systemic Lupus Erythematosus, at *www.mln.nih.gov* (A service of the Department of Health and Human Services,

National Institutes of Health and the U.S. National Library of Medicine). .

9. The rash of discoid lupus is round or disk shaped and is characterized by red, raised patches with adherent scales. The skin pores (follicles) may be plugged, and scarring often occurs in older lesions. Approximately 90% of individuals with discoid lupus have only skin involvement as compared to more generalized involvement in SLE. From MEDLINE Plus Medical Encyclopedia: Lupus, discoid, at *www.mln.nih.gov* (A service of the Department of Health and Human Services, National Institutes of Health and the U.S. National Library of Medicine).

10. Serositis may be demonstrated through pleuritic pain (chest pain). From MEDLINE Plus Medical Encyclopedia: Systemic Lupus Erythematosus, at *www.mln.nih.gov* (A service of the Department of Health and Human Services, National Institutes of Health), and The American College of Rheumatology at *www.rheumatology.org*.

11.· Antinuclear antibodies are antibodies produced by the immune system that attack the body's own tissues instead of foreign toxins. They are frequently present in people with SLE and, less commonly, in other diseases. From MEDLINE Plus Medical Encyclopedia: Antinuclear Antibody Panel, at *www. mln.nih.gov* (A service of the Department of Health and Human Services, National Institutes of Health and the U.S. National Library of Medicine).

The ALJ rejected Dr. Thompson's opinion that Dowles is disabled in favor of the opinions of the consulting internists, Dr. Orfaly and Dr. Davis, who examined Dowles one time and stated they believed her capable of working. However, whether Dowles could perform work activity (at least between SLE flare-ups) is irrelevant at this point. Since both Dr. Orfaly's and Dr. David's opinions focused on Dowles' residual functional capacity to perform work, and did not address the issues of whether she meets Listing 14.02 or the degree of severity of the involvement of her organs and body systems, their opinions are not helpful at this stage of the disability analysis.[12]

Dr. Thompson, one of Dowles' treating physicians, provided a detailed report on the body systems and organs involved by Dowles' SLE. The 1998 report by Dr. Thompson (Tr. pp. 194–196), states that Dowles has multiple organs/body systems involved by the lupus, including her skin (rashes and scarring), her nervous system (cereblitis), her liver (enlargement), her muscles (elevated CPK enzymes), and her digestive system (chronic nausea, vomiting and some weight loss), as well as anemia (causing malaise and fatigue) and severe osteoporosis (caused by Dowles' medication). These findings are supported by objective laboratory tests which are in the administrative record.

Listing 14.02(A) refers to other Listings to determine the severity of the involvement of particular body systems/organs. Obviously, Dowles' skin impairment is one of her predominant problems; she has both the classic malar rash and discoid lupus. Listing 14.02(A)(8) (skin involvement) refers to Listing 8.00ff to analyze the severity of an SLE skin impairment. Unfortunately, Listing 8.00ff does not exist. Listing 8.00(b), however, states "[w]hen skin lesions are associated with systemic disease and where that is the predominant problem, evaluation should occur according to the criteria in the appropriate section. Disseminated (systemic) lupus erythematosus and scleroderma usually involve more than one body system and should be evaluated under 14.02 and 14.04." Thus, for analysis of an SLE-related skin impairment, Listing 14.02 refers one to Listing 8.00, and Listing 8.00 then refers one back to Listing 14.02. In lieu of more concrete guidance, this court will refer to the other skin impairments (various forms of dermatitis) in Listing 8.00 for guidance as to what constitutes listing-level severity for skin involvement in SLE.

Listings 8.02, 8.03, 8.04, and 8.06[13] all require the claimant's dermatitis to involve "extensive lesions not responding to prescribed treatment." Listing 8.00(A) states that "skin lesions may result in a marked, long-lasting impairment if they involve extensive body areas or critical ones such as the hands or feet and become resistant to treatment. These lesions must be shown to have persisted for a sufficient period of time despite therapy for a reasonable presumption to be made that a marked impairment will last for a continuous period of at least 12 months." Listing 8.00(A) also recommends consideration of drug side effects.

In addition to the classic malar rash on Dowles' face, which has been documented since 1993, Dowles has discoid lupus, which periodically causes itchy lesions that even-

---

12. Moreover, since Dr. Orfaly found no history of rashes or lesions in Dowles' medical records, and apparently did not see the lesion scars on her chest, the foundation on which he based his opinion was, in part, erroneous.

13. Listing 8.05 is not analogous since it requires extensive lesions, including involvement of the hands or feet, which impose a marked limitation of function.

tually leave scars. Since there is no cure for lupus, the recurring rashes and lesions are necessarily "resistant to treatment." Dowles' medical records show she has suffered from frequently recurring malar rashes since at least 1993, and both Dr. Thompson's May 1998 report and Dr. Hebert's April 2000 report refer to the severe scarring from lesions on Dowles' chest. Finally, Dowles' extensive hair loss on her scalp (alopecia), caused by the rashes and lesions, has been well documented since May 1997 (Tr. p. 149). Therefore, Dowles meets Listing 14.02(A)(8), for severe involvement of her skin from SLE since at least the time she filed her claim for benefits on June 3, 1997 (protective filing date).

In addition to Listing 14.02(A), Dowles also meets Listing 14.02(B), by meeting the criteria for "lesser involvement" of 2 or more organs/body systems. Dowles' skin is involved at least at a "moderate level of severity," while her joints meet the second requisite involvement through arthritis in her extremities, as documented from 1993 through the latest medical records in the administrative record.

Dowles also meets the Listing 14.02(B) requirement of "severe fatigue, fever, malaise, and weight loss," which are primarily caused by anemia. Dowles' anemia is documented in the medical records since 1993, and her medical records indicate complaints and findings as to its effects, all of which is supported by the testimony by Dowles and her witnesses at her 2000 administrative hearing.

Finally, Dowles' medication includes steroids (Prednisone).[14] Listing 14.00(B)

specifically states, "[I]n addition to the connective tissue disorder per se, the chronic adverse effects of treatment (e.g. corticosteroid-related ischemic necrosis of bone) may result in functional loss." In this case, the ALJ found, incredibly, that Dowles' "has not required significant medical treatment for [pain, swelling, rashes]" (Tr. p. 231) and thus did not consider medication side-effects. However, it is noted that even Dr. Orfaly stated there was a need to test Dowles for peptic ulcer disease secondary to the steroid use, which could explain her weight loss. Dowles' steroid medications contributed to Dowles' anemia and osteoporosis.

Therefore, Dowles has shown that she has met Listing 14.02(B) since at least the time she filed an application for benefits on June 3, 1997 (protective filing date).

■ Dowles has shown she meets the requirements of Listing 14.02, in both (A) and (B), since at least the protective filing date of her SSI application on June 3, 1997, and thus is entitled to a presumption of disability and SSI benefits.

Accordingly, this case should be remanded to the Commissioner for a calculation of Dowles' SSI benefits from the June 3, 1997 protective filing date, to be done in an expedited manner.

### Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Dowles' appeal be GRANTED, the final decision of the Commissioner be REVERSED AND VACAT-

---

**14.** Prednisone is a corticosteroid. Its side effects include upset stomach, stomach irritation, vomiting, headache, dizziness, insomnia, restlessness, depression, anxiety, acne, increased hair growth, easy bruising, skin rash, swollen face, lower legs, or ankles, vision problems, cold or infection that lasts a long time, muscle weakness and black or tarry stools. Prednisone can also make you more susceptible to illnesses. Medline Plus Health Information, Drug Information: Prednisone Oral, available at www.medlineplus.gov (a service of the U.S. National Library of Medicine and the National Institutes of Health). See also, *Mendez*, 943 F.Supp. at 505 n. 4.

ED, and Dowles be AWARDED SSI BENEFITS from June 3, 1997.

IT IS FURTHER RECOMMENDED that the case be REMANDED to the Commissioner for a calculation of Dowles' SSI benefits from June 3, 1997.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**